UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

TRUSTEES OF THE LOCAL 531 PENSION FUND,

                        Plaintiffs,        REPORT AND
                                           RECOMMENDATION
              - against -
                                           CV 2007-529 (ARR)(MDG)

CORNER DISTRIBUTORS, INC.,

                        Defendant.

- - - - - - - - - - - - - - - - - - -X

GO, United States Magistrate Judge:

        Plaintiffs brought this action seeking to collect from

defendant Corner Distributors, Inc. ("Corner Distributors") the

outstanding amounts owed for "withdrawal liability" pursuant to

the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§§ 1001 et seq. ("ERISA"), as amended by the Multiemployer Pension

Plan Amendment Act of 1980, 29 U.S.C. §§ 1381 et seq. ("MPPAA").

The Honorable Allyne R. Ross referred this action to me to report

and recommend the amount of damages to be included in the

judgment.


                        PERTINENT FACTS

        The facts pertinent to this decision are undisputed and are

set forth in the Complaint ("Compl.") (ct. doc. 1), Affidavit of

Rachel S. Paster, Esq. in Support of Entry of Damages Upon Default

Judgment ("7/19/07 Paster Aff.") (ct. doc. 10), the Affidavit of

Actuary, Victor Harte, in Support of Plaintiffs' Motion for

Default Judgment ("Harte Aff.") (ct. doc. 11), and the Affidavit of Rachel S. Paster, Esq. in Further Support of Entry of Damages Upon Default Judgment ("1/24/08 Paster Aff.") (ct. doc. 15).

Plaintiffs are the trustees of the Local 531 Pension Fund (the "Fund"), which consists of various employee benefit plans and multi-employer plans within the meaning of ERISA administered by the plaintiffs. See Compl. at ¶ 5. Corner Distributors is a New York corporation and is an employer affecting commerce within the meaning of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 152(2), (6) and (7). See id. at ¶¶ 5, 6.

For a period of years, defendant and other employers entering into a series of collective bargaining agreements with International Brotherhood of Teamsters ("Local 531")[1] were required to make regular contributions to the Fund on behalf of its employees. See id. at ¶¶ 7, 8. In November 1997, the collective bargaining agreement ("CBA") between Local 531 and Corner Distributors, as well as the agreement between Local 531 and other signatory employers, was amended to eliminate the obligation of the signatory employers to make monthly contributions to the Fund. See id. at ¶ 8. As a result of this amendment to the CBA, the Fund was terminated by a mass withdrawal

_____

[1] Prior to 1972, Local 531, International Brotherhood of Teamsters was known as Local 320 of the Production Sales & Service Employees ("Local 320"). The pension fund also changed its name to Local 531, but continued to use the Trust Agreement for Local 320. See 1/24/08 Paster Aff. at ¶ 4; 7/19/07 Paster Aff., Exh. C (Agreement and Declaration of Trust dated May 16, 1962).

as set forth in 29 U.S.C. § 1341a(a)(2).  See id. at ¶ 9.

Defendant permanently ceased to have any obligation to make

monthly contributions to the Fund as of December 1, 1997, thereby

causing its complete withdrawal from the Fund within the meaning

of 29 U.S.C. § 1383(a).  See id. at ¶ 10.

In a letter dated March 27, 1998, the plaintiffs informed

defendant that its initial withdrawal liability had been

determined pursuant to 29 U.S.C. § 1391(c) and amounted to

$69,398.49.  See 7/19/07 Paster Aff. at ¶ 7 and Exh. D (Letter

dated March 27, 1998).  The letter stated that defendant's total

withdrawal liability of $69,398.49 was to be paid out in 46

quarterly installments of $2,095.20 each, with a final payment of

$344.34 due on November 1, 2009.  However, the plaintiffs also

informed defendant that "[s]ince there has been a withdrawal of

substantially all employers from the Plan, the law and Pension

Benefit Guaranty Corporation ("PBGC")[2] regulations require that

the amount of withdrawal liability be redetermined and

reallocated."  7/19/07 Paster Aff., Exh. D at 3.

---

[2]     The Pension Benefit Guaranty Corporation ("PBGC") is a
wholly-owned government corporation within the Department of
Labor that was created by Congress under ERISA to encourage the
continuation and maintenance of private-sector defined benefit
pension plans, provide timely and uninterrupted payment of
pension benefits, and keep pension insurance premiums at a
minimum.  See 29 C.F.R. § 1302; T.I.M.E.-DC, Inc. v. Mgmt.-Labor
Welfare & Pension Funds of Local 1730 Int'l Longshoremen's Ass'n,
756 F.2d 939, 943 (2d Cir. 1985); see also
http://www.pbgc.gov/about/about.html (last visited May 21, 2008).

Thereafter, plaintiffs' actuary recalculated the withdrawal liability in accordance with 29 C.F.R. § 4219.15 using assumptions specified by the PBGC and determined that defendant's additional liability, or reallocation liability, amounted to $57,931.26. <u>See</u> 7/19/07 Paster Aff. at ¶ 10. By letter dated January 27, 1999, the Fund informed defendant that its total withdrawal liability was $128,917.01, which was to be paid out in 123 quarterly installments of $2,095.20 each, with a final payment of $1,662.37 due on February 1, 2029. <u>See</u> Compl. at ¶¶ 14, 16 and Exh. A; 7/19/07 Paster Aff. at ¶ 17 and Exh. G (Draft Letter dated January 27, 1999). In this and a prior letter of March 27, 1998, plaintiffs informed defendant of its right to have the Fund review its determination and to seek to have any dispute resolved through arbitration within the time period prescribed by the PBGC and ERISA.

Defendant paid a total of $50,284.86 toward its withdrawal liability obligation, including a payment of $38,090.76 for delinquent quarterly payments and interest.[3] <u>See</u> 7/19/07 Paster Aff. at ¶ 14 and Exh. H (Letter dated March 24, 2004). Beginning May 1, 2004, defendant once again ceased paying quarterly

---

[3]     Plaintiffs do not clearly state in their submissions the dates and amounts of defendant's other payments. Since plaintiffs' submissions indicate that defendant also made $12,571.26 in withdrawal liability payments and defendant's first quarterly withdrawal payment of $2,095.20 was due on May 1, 1998, this Court surmises that defendant made payments through August 1, 1999 before defaulting on payment on November 1, 1999 until April 13, 2004.

-4-

installments in accordance with the payment schedule.  See Compl.
at ¶ 18.  Because defendant failed to cure its default, the Fund
now seeks acceleration of the entire remaining withdrawal
liability under 29 U.S.C. §§ 1399(c)(2) and (c)(5).  See id. at
¶ 22.  Since defendant made payments totaling $50,284.86 prior to
its default in payments beginning on May 1, 2004, the principal
amount of withdrawal liability owed by defendant is $78,632.15.
See 7/19/07 Paster Aff. at ¶ 17.

On February 7, 2007, plaintiffs commenced this action seeking
judgment for the balance of defendant's withdrawal obligation,
accrued interest on the withdrawal liability, liquidated damages,
pre-judgment interest, and reasonable attorneys' fees and costs
pursuant to 29 U.S.C. §§ 1399(c)(5)-(6) and 1132(g)(2).  See
Compl. at ¶¶ 22, 23, 26 and Wherefore Clause.  By order dated
April 19, 2007, I directed the Fund to provide affidavits in
support of the requested relief by May 31, 2007, see ct. doc. 6,
and granted plaintiff's request for an extension to do so by July
20, 2007.  See order entered on 05/18/2007.  On January 4, 2008,
the Court held a hearing to obtain further information with regard
to plaintiffs' damages calculation and instructed plaintiffs to
make additional submissions.  See minute entry entered on
01/08/2008.  On January 24, 2008, plaintiffs submitted an
affidavit of Rachel S. Paster in further support of entry of
damages upon default judgment.  See ct. doc. 15.  No responses
have been filed by Corner Distributors.

DISCUSSION

I.  Legal Standards Governing Default

     A default constitutes an admission of all well-pleaded
factual allegations in the complaint, except for those relating to
damages.  See Greyhound Exhibitgroup Inc. v. E.L.U.L. Realty
Corp., 973 F.2d 155, 158 (2d Cir. 1992); Au Bon Pain Corp. v.
Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).  Only "in very
narrow, exceptional circumstances" may a court find an allegation
not "well pleaded."  TWA v. Hughes, 449 F.2d 51 (2d Cir. 1971),
rev'd on other grounds, 409 U.S. 363 (1973); Niles v. Palmer,
No. 97 CIV. 7573 (JSM)(KNF), 1999 WL 1419042, at *5 (S.D.N.Y. Oct.
22, 1999).

     A defaulting party ordinarily cannot contest the merits of
the plaintiff's claim absent "indisputable" contradictory
evidence.  See Au Bon Pain, 653 F.2d at 65; TWA, 449 F.2d at 63-
64.  A default also effectively constitutes an admission that
damages were proximately caused by the defaulting party's conduct;
that is, the acts pleaded in a complaint violated the laws upon
which a claim is based and caused injuries as alleged.  See
Greyhound, 973 F.2d at 159; TWA, 449 F.2d at 69-70.  The movant
need prove "only that the compensation sought relate[s] to the
damages that naturally flow from the injuries pleaded."
Greyhound, 973 F.2d at 159.  As long as there is a "sufficient
basis from which to evaluate the fairness" of the sum awarded, a
court may rely upon detailed affidavits and documentary evidence

in determining damages. <u>Fustok v. ContiCommodity Servs., Inc.</u>, 873 F.2d 38, 40 (2d Cir. 1989). The moving party is entitled to all reasonable inferences from the evidence it offers. <u>See</u> <u>Au Bon Pain</u>, 653 F.2d at 65; <u>DIRECTV, Inc. v. Hamilton</u>, 215 F.R.D. 460, 462 (S.D.N.Y. 2003).

However, "[e]ven after [a] default ... it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." <u>Leider v. Ralfe</u>, No. 01 Civ. 3137 (HB)(FM), 2004 WL 1773330, at *7 (S.D.N.Y. July 30, 2004) (quoting <u>In re Indus. Diamonds Antitrust Litig.</u>, 119 F. Supp. 2d 418, 420 (S.D.N.Y. 2000) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2688, at 62 (3d ed. 1988))).

## II. <u>Liability</u>

The Multiemployer Pension Plan Amendments Act ("MPPAA") requires employers who cease contributing to a multiemployer pension fund to pay "withdrawal liability," a sum that represents a portion of the fund's "unfunded vested benefits." <u>See</u> 29 U.S.C. § 1381. After an employer withdraws from a multiemployer plan, the plan sponsor must determine the withdrawal liability. <u>See</u> 29 U.S.C. § 1382(1). Once the plan sponsor has computed the withdrawal liability in accordance with 29 U.S.C. § 1391, it must notify the employer of the amount of its withdrawal liability, the schedule for making payments, and demand payment in accordance

with the schedule.  <u>See</u> 29 U.S.C. § 1399(b)(1).  The employer then has up to 90 days after receipt of the notice described in 29 U.S.C. § 1399(b)(1), <u>inter alia</u>, to ask the plan sponsor to review any specific matters relating to the employer's liability and the schedule of payments.  <u>See</u> 29 U.S.C. § 1399(b)(2)(A).  Any dispute arising out of the Fund's determination and review must be resolved through arbitration in accordance with 29 U.S.C. § 1401(a)(1).

When an employer is in default, "the Fund [is] entitled to require immediate payment of the entire withdrawal liability amount demanded plus interest."  <u>Bowers v. Transportacion Maritima Mexicana, S.A.</u>, 901 F.2d 258, 265 (2d Cir. 1990) (citing 29 U.S.C. § 1399(c)(5) and <u>New York State Teamsters Conference Pension & Ret. Fund v. McNicholas Transp. Co.</u>, 848 F.2d 20, 23 (2d Cir. 1988)).  An employer is in default when it fails to make a payment when due and does not cure such failure within 60 days of receiving written notification from the plan sponsor.  <u>See</u> 29 U.S.C. § 1399(c)(5)(A).  An employer can also be in default if it engages in "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability."  29 U.S.C. § 1399(c)(5)(B).

Here, plaintiffs have satisfied the statutory prerequisites for seeking damages from defendant for the entire unpaid amount of withdrawal liability.  First, plaintiffs provided defendant with

notice of its reallocation liability in a letter dated January 25, 1999 which contains calculations setting forth defendant's withdrawal liability and a payment schedule.  See 7/19/07 Paster Aff. at ¶¶ 12-13 and Exhs. F (Letter from Plaintiffs' Actuary dated January 25, 1999) and G.  Neither seeking review nor contesting the withdrawal amount or the schedule of payments through arbitration, defendant made payments toward its withdrawal liability obligation until November 1, 1999.  See 7/19/07 Paster Aff. at ¶ 14.  After making a payment of $38,090.76 on April 13, 2004, defendant then failed to make any further payments for contributions due on and after May 1, 2004.

On February 8, 2007, plaintiffs provided notice of defendant's default by serving defendant with a copy of the complaint that commenced this action.  See Bowers, 901 F.2d at 265 (2d Cir. 1990); see also Debreceni v. Merchs. Terminal Corp., 740 F. Supp. 894, 900 (D. Mass. 1989) ("filing of [the] lawsuit was sufficient notice of the duty to cure").  In their complaint, plaintiffs allege that defendant is in default of its withdrawal liability obligation, has failed to make payments as set forth in the schedule of payments, and is liable for the entire balance of the unpaid withdrawal liability.  I find that plaintiffs provided sufficient notice of defendant's default by serving defendant with the complaint.  See Bd. of Trs. of Trucking Employees of N. Jersey Welfare Fund, Inc.-Pension Fund v. Canny, 900 F. Supp. 583, 591 (N.D.N.Y. 1995) (complaint containing information on amount of

assessment, schedule of payments, and demand for payment constitutes sufficient notice under the MPPAA).  Since defendant did not cure its failure to make timely withdrawal liability payments within 60 days of receipt of the complaint, the Court agrees with plaintiffs that a default within the meaning of 29 U.S.C. § 1399(c)(5) has occurred and defendant is liable to the Fund under ERISA for the full amount of its withdrawal liability. See id.

III. Determination of Damages

In the event of a default, the Fund is entitled to require immediate payment of the balance of the principal amount of withdrawal liability, plus accrued interest on that amount from the due date of the first payment that was not timely made.  See 29 U.S.C. § 1399(c)(5).  The MPPAA also provides that an employer liable for withdrawal liability payments under the MPPAA should be "treated in the same manner as [an employer liable for] a delinquent contribution" under ERISA.  See 29 U.S.C. § 1451(b); see also Rao v. Prest Metals, 149 F. Supp. 2d 1, 10-11 (E.D.N.Y. 2001).  Accordingly, the Fund is entitled to damages under 29 U.S.C. § 1132(g)(2), which provides that a fiduciary enforcing provisions of an employee benefit plan is entitled to recover:

> (A) the unpaid contributions, (B) interest on the unpaid
> contributions, (C) an amount equal to the greater of --
> (i) interest on the unpaid contributions, or (ii)
> liquidated damages provided for under the plan in an
> amount not in excess of 20 percent ... of the [unpaid
> contributions], (D) reasonable attorney's fees and costs
> of the action ....

29 U.S.C. § 1132(g)(2).

A.   <u>Outstanding Withdrawal Liability</u>

Plaintiffs' actuary calculated defendant's withdrawal liability to be $128,917.01.  <u>See</u> 7/19/07 Paster Aff. at ¶ 12; <u>see also</u> Harte Aff. at ¶ 6.  Prior to its default in payments due beginning on May 1, 2004, defendant made payments totaling $50,284.86.  <u>See</u> 7/19/07 Paster Aff. at ¶ 12.  Thus, I respectfully recommend that plaintiffs be awarded $78,632.15, which reflects the remaining principal amount of withdrawal liability owed by defendant.  <u>See</u> <u>id.</u> at ¶ 17.

B.   <u>Accrued Interest</u>

Plaintiffs also seek interest on the remaining principal amount of withdrawal liability owed by defendant pursuant to 29 U.S.C. § 1399(c)(5), 29 U.S.C. § 1132(g)(2) and provisions set forth in the Local 531 Pension Fund Plan Rules ("Plan Rules"). <u>See</u> 1/24/08 Paster Aff., Exh. C (Local 531 Pension Fund Plan Rules).  Plaintiffs utilize varying interest rates to calculate the accrued interest.  For indebtedness due prior to September 21, 2006, plaintiffs state that the Plan Rules applied interest rates prescribed by the applicable PBGC regulations.  <u>See</u> 1/24/08 Paster Aff. at ¶ 13.  The Plan Rules specifically state that "[i]nterest shall be charged at rates based on prevailing market rates for comparable obligations, in accordance with regulations prescribed by the PBGC." <u>See</u> 1/24/08 Paster Aff., Exh. C. at 14-6.  The PBGC regulations state that interest should be charged quarterly at "an

-11-

annual rate equal to the average quoted prime rate on short-term commercial loans for the fifteenth day ... of the month preceding the beginning of each calendar quarter, as reported by the Board of Governors of the Federal Reserve System ...." 29 C.F.R. § 4219.32(b). On September 21, 2006, the board of trustees adopted an interest rate of 5.6% per annum for unpaid withdrawal liability. See 1/24/08 Paster Aff. at ¶ 13; see also 7/19/07 Paster Aff., Exh. J (Minutes of a Meeting of the Trustees on September 21, 2006).

I respectfully recommend that the Court award interest based on the interest rates adopted by the plaintiffs under the Plan Rules. Section 502(g)(2)(B) of ERISA authorizes an award of "interest on unpaid contributions ... determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of [the Internal Revenue Code]." 29 U.S.C. § 1132(g)(2). In any event, the rates of the PBGC and the interest rate of 5.6% per annum later adopted by the Trustees are commercially reasonable.[4] See Trs. of Ret. Fund of Amalgamated Ins. Fund v. Lopal Sec., Inc., 07 Civ. 1218 (RMB)(AJP), 2007 WL 1576259, *2 (S.D.N.Y. June 1, 2007) (finding that fund's provision for 10% interest is reasonable) (citing Bd. of Trs. of Trucking

---

[4]    The underpayment rate under the Internal Revenue Code has fluctuated between 4% and 8% since May 1, 2004, while the PBGC interest rate has fluctuated between 4% and 8.25%.  See https://www.dol.gov/ebsa/calculator/a2underpaymentrates.html (IRC section 6621(a)(2) Underpayment Rates Table) (last visited on May 21, 2008); https://www.pbgc.gov/practitioners/interest-rates/content/hr1130.html (last visited on May 21, 2008).

Employees of N. Jersey Welfare Fund, Inc.-Pension Fund v. Kero Leasing Corp., 377 F.3d 288, 304-05 (3d Cir. 2004) (district court properly set interest rate at 10% where plan agreement specified 10% interest rate for overdue withdrawal liability)).

Plaintiffs argue that interest should be calculated on the total amount of defendant's unpaid withdrawal liability from the first day that defendant failed to make a scheduled payment. In support of their position, plaintiffs contend that both 29 U.S.C. § 1399(c)(5) and the Plan Rules provide for interest to accrue on the total outstanding withdrawal liability amount from the due date of the first payment which was not timely made. See 1/24/08 Paster Aff. at ¶ 17 and Exh. C at 14-5. Furthermore, plaintiffs refer to decisions by a circuit and district court outside the Second Circuit in which the courts granted interest from the first day the defendant failed to make a scheduled payment and where the filing of the lawsuit was sufficient notice of defendant's duty to cure. See Debreceni, 740 F. Supp. at 900; Miller v. ADCO Liberty Mfg. Corp., No. 04-CV-3378 (WJM), 2005 WL 2044901, at *3 (D.N.J. Aug. 24, 2005). However, where notice of default is in the form of the complaint used to initiate the lawsuit, some courts have calculated the interest from the date the defendant was served. The Second Circuit, in Bowers, directed the district court to calculate the amount of the award from the date the complaint was served since it imposed liability on the basis of notice given by the complaint. See Bowers, 901 F.2d at 265. Even if dicta, this

Court is bound to follow the reasoning in <u>Bowers</u> which requires compliance with statutory requirements of notice prior to acceleration of the withdrawal liability.

Plaintiffs also contend that the Plan Rules set forth two additional events that may serve as the basis for determining an employer's default under 29 U.S.C. § 1399(c)(5)(B). <u>See</u> 1/24/08 Paster Aff. at ¶ 11 and Exh. C. at § 14.11(c). Specifically, plaintiffs point to the provision which states that an employer is in default when "[t]he [e]mployer ceases to exist, become insolvent or becomes the subject of bankruptcy proceedings." 1/24/08 Paster Aff., Exh. C at § 14.11(c)(ii). Plaintiffs claim that "the Trustees determined that [defendant] had ceased to exist, and upon that basis, determined that [defendant] was unable to perform and therefore in default of its withdrawal liability obligation." 1/24/08 Paster Aff. at ¶ 12. This argument is unpersuasive since subsection 1399(c)(5) permits acceleration only after a failure to cure upon notice as well as an event of default under a plan.

Therefore, I respectfully recommend that plaintiffs be granted (1) interest[5] on each late payment that became due from the date that payment was due through February 7, 2007 of

---

[5] The Fund and the PBGC utilize different starting dates for their quarterly periods. Specifically, PBGC's quarters begin on 1/1, 4/1, 7/1 and 10/1 whereas the Fund's quarters begin on 2/1, 5/1, 8/1 and 11/1. In order to simplify the interest calculation, I applied the PBGC interest rate in effect as of the first day of the quarter in which the payment was due. <u>See</u> Appendix A (Accrued Interest Calculations).

$2,445.39; (2) interest on the accelerated withdrawal liability from February 8, 2007 through May 31, 2008 in the amount of $5,858.97, see Appendix A (Accrued Interest Calculations); and (3) interest at a rate of $12.23 per day until entry of judgment.

### C.    Liquidated Damages

ERISA also mandates the award of liquidated damages in an amount equal to the greater of the interest on the unpaid contributions or liquidated damages provided for under the plan in an amount not in excess of 20 percent of the unpaid contributions. See 29 U.S.C. § 1132(g)(2). The Plan Rules also provide that "the [e]mployer shall pay the Plan liquidated damages equal to the greater of 20% of the amount due or the interest [due]." See 1/24/08 Paster Aff. at ¶ 20 and Exh. C. at ¶ 14.11(e).

Here, the interest on the unpaid withdrawal liability amounts to $8,304.36 ($2,445.39 + $5,858.97), while 20 percent of the unpaid withdrawal liability equals $15,726.43. Therefore, I respectfully recommend that the Court award plaintiffs the greater amount of $15,726.43 as liquidated damages.

### D.    Attorneys' Fees and Costs

In addition to accrued interest and liquidated damages, plaintiffs request attorneys' fees and costs associated with this litigation. See 7/19/07 Paster Aff. at 20; 1/24/08 Paster Aff. at 22. Section 502(g)(2) of ERISA provides that, in any action by a fiduciary for a plan in which a judgment in favor of the plan is awarded, "the court shall award the plan reasonable attorney's

fees and costs of the action, to be paid by the defendant[.]" 29
U.S.C. § 1132(g)(2)(D). Because the award of attorneys' fees is
not discretionary, the court's sole duty is to determine what
amount is reasonable. See Labarbera v. Clestra Hauserman, Inc.,
369 F.3d 224, 226 (2d Cir. 2004); see also O'Farrell v. Twin Bros.
Meats, Inc., 889 F. Supp. 189, 192 (E.D.Pa. 1995).

The standard method for determining the amount of reasonable
attorneys' fees is "the number of hours reasonably expended on the
litigation multiplied by a reasonable hourly rate," or the
lodestar. Hensley v. Eckerhart, 461 U.S. 424, 434 (1983);
Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053,
1058-59 (2d Cir. 1989). A party seeking attorneys' fees bears the
burden of supporting its claim of hours expended by accurate,
detailed and contemporaneous time records. New York State Ass'n
for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147-48 (2d
Cir. 1983). Hours that are "excessive, redundant, or otherwise
unnecessary" should be excluded. Hensley, 461 U.S. at 434.
Plaintiffs request $11,813.25 in attorneys' fees and $445.14 in
costs incurred through January 17, 2008.[6] See 1/24/08 Paster Aff.
at ¶¶ 22, 23. Plaintiffs' counsel's affidavit sets forth the
hourly billing rates for the attorneys and paralegal who worked on
the case. See 7/19/07 Paster Aff. at ¶ 25. Plaintiffs' counsel
also provided contemporaneous time records which describe, by

---

[6]    Plaintiffs' counsel's time records were generated on
January 17, 2008. See 1/24/08 Paster Aff., Exh. G (time
records).

attorney or paralegal, the nature of the work done, the hours expended, the dates, and the costs incurred during the prosecution of this case. See 1/24/08 Paster Aff., Exh. G (time records).

The reasonableness of the hourly rates charged should be based on "the prevailing marketplace rates in the community for similar services by a lawyer of reasonably comparable skill, experience, and reputation." Cruz v. Local Union No. 3 of IBEW, 34 F.3d 1148, 1159 (2d Cir. 1994) (citing Blum v. Stenson, 465 U.S. 886, 896 (1984)). Determination of the prevailing market rates may be based on evidence presented or a judge's own knowledge of hourly rates charged in the community. Chambless, 885 F.2d at 1059. The Court in Rikhy noted that "[h]ourly rates approved in recent Eastern District of New York cases have ranged from $200 to $300 for partners, $100 to $150 for junior associates, and $200 to $250 for senior associates." Comm'n Express Nat'l, Inc. v. Rikhy, No. CV-03-4050 (CPS), 2006 WL 385323, at *6 (E.D.N.Y. Feb. 17, 2006) (quoting Aiello v. Town of Brookhaven, No. 94-CV-2622 (FB)(WDW), 2005 WL 1397202, at *5 (E.D.N.Y. June 13, 2005)) (internal quotations omitted); see also Morin v. Nu-Way Plastering, Inc., No. CV 03-405 (LDW)(ARL), 2005 WL 3470371, at *2 (E.D.N.Y. Dec. 19, 2005) (same).

Plaintiffs' counsel have submitted time records[7] for time

_____

[7] Plaintiffs claim attorneys fees of $11,813.25. See 1/24/08 Paster Aff. at ¶ 24. However, the "grand total" reflected on the time records is $11,774.79 and includes $462.29 for costs reflected in entries for Ms. Paster on 2/1/07, 2/7/07, 3/27/07, 4/19/07, 5/17/07 and 1/2/08. See id., Exh. G. The

-17-

spent on this case from November 30, 2006 through January 16, 2008 by the following individuals:  Charles Pergue, a partner who graduated from New York Law School and was admitted to practice law in New York State in 1992; Joshua Parkhurst, an associate who graduated from New York University Law School and was admitted to practice law in New York State in 1997; and Rachel Paster, an associate who graduated from the University of Michigan Law School and was admitted to practice law in New York State in 2001.  See 7/19/07 Paster Aff. at ¶¶ 22-24; see also 1/24/08 Paster Aff., Exh. G.  Plaintiffs request $250 per hour for each of the three attorneys and $125 per hour for the paralegal.  See 7/19/07 Paster Aff. at ¶ 25.

Based on my general knowledge of plaintiffs' counsel's practice, their work on ERISA cases in this district and my knowledge of prevailing rates for such matters in New York, see Rotella v. Bd. of Educ. of City of New York, No. 01 CIV. 0434 (NGG), 2002 WL 59106, at *2-3 (E.D.N.Y. Jan. 17, 2002), I find that the rate sought for Mr. Pergue is reasonable but the rates for Mr. Parkhurst and Ms. Paster are not.  Mr. Pergue has been practicing law for approximately 16 years and has extensive experience in representing multiemployer benefit plans in ERISA collection actions.  See 7/19/07 Paster Aff. at ¶ 23.  This Court does not believe that Mr. Parkhurst, with approximately 11 years

---

amount of "billable" attorney time totaled $11,062.50 and $250 for paralegal time.

of legal experience, and Ms. Paster, with approximately 7 years of legal experience should be awarded the same hourly rate as their colleague with more experience.  See Trs. of Local 807 Labor Mgmt. Health & Pension Funds v. River Trucking and Rigging, Inc., No. CV-03-3659 (JMA), 2005 WL 3307080, at *3 (E.D.N.Y. Dec. 2, 2005) (noting that junior associate and partner billing at the same rate "is unreasonable and not in accordance with the attorney billing practices in this district.").  Therefore, I respectfully recommend reducing Mr. Parkhurst's rate to $225 per hour and Ms. Paster's rate to $200 per hour.

Furthermore, plaintiffs' request for paralegal fees of $125 per hour does not appear to be reasonable.  Generally, courts in this district and within the Second Circuit have awarded paralegal fees ranging from $50 per hour to $80 per hour in ERISA cases. See Jacobson v. Peterbilt Elec. Contracting, Inc., CV-03-3413 (CPS), 2008 WL 1744544 at *4 (E.D.N.Y. Apr. 11, 2008) (awarding $80 per hour for paralegal); Trs. of Plumbers and Pipefitters Nat'l Pension Fund v. Daniel Weintraub & Assocs., Inc., No. 04-CV-2611 (FB)(CLP), 2007 WL 4125453, at *11 (E.D.N.Y. Nov. 16, 2007) (finding that rates of $50 and $75 per hour for paralegals are commensurate with the prevalent market rate in this district); see also Finkel v. Tech Man, Inc., No. 06-CV-2264 (CPS), 2007 WL 433399, at *4 (E.D.N.Y. Feb. 6, 2007) (awarding $75 per hour for paralegal).  Thus, I respectfully recommend reducing the paralegal's hourly rate to $80 per hour.

Plaintiffs' counsel submitted contemporaneous time records showing that attorneys spent 44.25 hours of time and paralegals spent 2.0 hours on this case. Although the time records contain separate daily entries for the work completed, the attorneys utilized "block billing" for their daily entries. As such, many of the entries are not sufficiently detailed to enable an adequate determination of the reasonableness of the hours claimed for any given task. Because "block billing" prevents the court from identifying hours billed for specific activities, a percentage reduction or other reduction of the requested hours is warranted. See Hensley, 461 U.S. at 441 (courts may reduce the requested hours, hourly rate and/or make aggregate percentage reductions where, as in this instance, it is difficult to separate hours billed for specific tasks); Molefi v. Oppenheimer Trust, No. 03 CV 5631 (FB)(VVP), 2007 WL 538547, at *7 (E.D.N.Y. Feb. 15, 2007) (applying 15% reduction for block billing and excessive charges); Aiello, 2005 WL 1397202, at *3 (applying 10% reduction for block billing); Ass'n of Holocaust Victims for Restitution of Artwork and Masterpieces v. Bank Austria Creditanstalt AG, No. 04 Civ. 3600 (SWK), 2005 WL 3099592, at *5 & n.9 (S.D.N.Y. Nov. 17, 2005) (reducing lodestar by 25% for "block billing, vagueness and excess"); Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc., 277 F. Supp. 2d 323, 326 (S.D.N.Y. 2003) (applying 15% reduction for block billing and excessive time entries); In re Aston Baker, 374 B.R. 489, 495 n.7 (Bankr. E.D.N.Y. 2007) (reductions of 5% to 100%

in legal fees in instances where block billing occurs) (collecting cases). Counsel's time records indicate that block billing was utilized in a majority of the entries made. However, I do not find that the amount of time billed for the work performed in this case is unreasonable. Thus, I respectfully recommend that plaintiffs' counsel's fees be reduced by 5%. After reducing the hourly rates for Mr. Parkhurst, Ms. Paster and Mr. Hewitt as stated above and making a 5% across the board reduction, I recommend an award of $8,856.38 ($9,322.50 - 5%). <u>See</u> Appendix B (Attorneys' Fees Calculations).

Plaintiffs also seeks an award of $445.14 for costs associated with the filing of this action, service of process, and postage fees. <u>See</u> 7/19/07 Paster Aff. at ¶ 28. However, the attorneys' time records reflect costs billed in the amount of $462.29. Costs are reimbursable so long as they were incidental and necessary to the representation of the client. <u>See</u> <u>S.E.C. v. Goren</u>, 272 F. Supp. 2d 202, 214 (E.D.N.Y. 2003). As plaintiffs' counsel has provided adequate documentation to support its request, plaintiffs should be awarded $462.29 for costs. Thus, I respectfully recommend that plaintiffs be awarded $9,318.67 ($8,856.38 + $462.29) in attorneys' fees and costs.

## CONCLUSION

For the foregoing reasons, I recommend that the Court award plaintiffs judgment in the amount of $111,981.61 based on the total following damages: (a) $78,632.15 for the withdrawal

liability; (b) $8,304.36 in accrued interest on each late payment due through February 7, 2007, as well as, the withdrawal liability from February 8, 2007 through May 31, 2008, and at a rate of $12.23 per day on the withdrawal liability until the date of judgment; (c) $15,726.43 in liquidated damages; and (d) $9,318.67 for reasonable attorneys' fees and costs.

This report and recommendation will be filed electronically and a copy sent by overnight mail to the defendant on this date. Any objections to this Report and Recommendation must be electronically filed, with a courtesy copy sent to the Honorable Allyne R. Ross and the undersigned, by June 10, 2008. Failure to file objections within the specified time waives the right to appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

**SO ORDERED.**

Dated:   Brooklyn, New York
         May 21, 2008

                                     _____/s/_____
                                     MARILYN DOLAN GO
                                     UNITED STATES MAGISTRATE JUDGE